**BLUE CROSS & BLUE SHIELD UNITED OF WISCONSIN** and **Compcare Health Services Insurance Corporation, Plaintiffs,**

v.

**The MARSHFIELD CLINIC** and **Security Health Plan of Wisconsin, Inc., Defendants.**

No. 94–C–137–S.

United States District Court, W.D. Wisconsin.

March 22, 1995.

James R. Troupis, Michael, Best & Friedrich, Madison, WI, for Blue Cross & Blue Shield United, Compcare Health Services Ins.

Steven J. Caulum, Bell, Metzner, Gierhart & Moore, Madison, WI, for Marshfield Clinic, Security Health Plan of Wis.

### MEMORANDUM

SHABAZ, District Judge.

Plaintiffs Blue Cross & Blue Shield United of Wisconsin ("Blue Cross") and Compcare Health Service Insurance Corporation ("Compcare") commenced an antitrust action against defendants Marshfield Clinic ("Marshfield") and Security Health Plan of Wisconsin, Inc. ("Security") for money damages, injunctive and declaratory relief. The case was tried to a jury which found for plaintiffs on each question of the Special Verdict finding that (1) plaintiffs established one or more primary care, pediatric care, specialty care and HMO services relevant product and geographical markets and (2) monopoly power therein, (3) defendants engaged in anti-competitive conduct to obtain monopoly power, (4) defendants attempted and (5) conspired to obtain monopoly power, (6) defendants entered into a contract, combination, or conspiracy to unreasonably restrain trade, and (7) defendants allocated customers, territories, product or service markets and fixed fees or prices. The jury found damages in the amount of $10.5 million in favor of Blue Cross and $5,669,227 in favor of Compcare against the defendants. The Court trebled the damages and entered judgment. The action is before this Court on defendants' motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure and/or a new trial pursuant to Rule 59 on both the liability and damage verdicts and on plaintiffs' motion for injunctive and declaratory relief.

### RULE 50 MOTION

■ When addressing defendants' motion for judgment as a matter of law the Court must determine whether the evidence presented combined with all reasonable inferences that may be drawn from it, is sufficient to support the verdict when viewed in the light most favorable to the party winning the verdict. Any conflicts in the evidence must be resolved in favor of the party winning the verdict, and every permissible inference favoring that party must be drawn. *Tennes v. Massachusetts Dept. of Revenue*, 944 F.2d 372, 377 (7th Cir.1991)

■ The Court does not evaluate the credibility of witnesses, nor otherwise weigh the evidence nor consider the numerous post trial affidavits submitted by the parties and those other evidentiary responses which plaintiffs oppose in objecting to defendants' motion for leave to file a sur-reply. Further, when entering its order concerning defendants' motion for judgment as a matter of law or new trial the Court does not consider the numerous petitions, letters, editorials, articles and communications addressed to it which may be better suited for consideration

by a legislative body or member thereof. Had both sides expended their energies before trial as they did after trial they might have received a satisfactory verdict. As determined on the Friday before trial, all evidence shall be presented at trial. Once concluded and a verdict entered no further evidence will be considered. The Court's examination of the trial record and motions relating thereto is the basis for its decisions on the motions it will now address.

The jury had sufficient evidence including the testimony of plaintiffs' expert Warren Greenberg to find that plaintiffs had established one or more of the following relevant product and geographical markets: primary care, pediatric care and one or more specialty care markets. Greenberg specifically defined 13 product markets concerning primary care, pediatrics, specialty care and their geographical limitations. The jury could have readily determined that in nine relevant product and geographical markets Marshfield had a market share in excess of 60% for three years 1991 to 1993. His testimony was supplemented with statistical and economic tests according to Elzinger Hogarty. Although he had not studied a separate HMO economic market for trial or in his prior work, having failed to conclude that there is an HMO services market separate from other forms of health care financing—such as PPOs, POS and regular indemnity insurance, the jury could have also determined that he did not reject the probability thereof.

■ There is a further legally sufficient evidentiary basis for a reasonable jury to find that plaintiffs established a relevant product and geographical market in HMO services. The Court acknowledges the importance of finding an HMO market. Without an HMO market, plaintiff Compcare's claim for exclusion from the market cannot stand. Plaintiff's late attempts to argue an alternative basis for liability are to no avail.

The jury had before it the testimony of Michael E. Bernstein from which it could reasonably find from the experiences which he brought that there is a specific HMO Market. (Tr. at 83.) He cited federal law for qualified HMOs which employers are required to provide where they have more than 25 employees and that HMOs compete with one another for such considerations.

Vicki Thoreson, sales director for Blue Cross/Blue Shield for the North Central region testified she sold products other than HMOs and that Security HMO does not compete with these products. From her testimony the jury could find that plaintiffs' PPO plan is a totally different type product than the Security HMO and that customers perceive a fee for service plan as different from an HMO which has different pricing and characteristics.

Jeffrey J. Nohl, president of Compcare which sells HMO products, specifically described those features from which the jury could reasonably find that an HMO is other than traditional indemnity insurance. Nohl stressed the managed care aspects of an HMO as a separate product. Based upon his ten years of experience in the HMO market he testified as an expert that an HMO is not a financial mechanism as is indemnity insurance. He referred also to separate federal and state laws and regulations relating to the HMO as well as those regulations which separate surplus and capital. The State of Wisconsin has a program for state employees which provides HMO health care for which HMOs may compete. Although Nohl admittedly is not that expert who commands a fee in excess of $400,000.00, nonetheless he testified to three distinct characteristics.

The jury was advised of three distinct characteristics to include, first, the gate keeper where a patient chooses a primary care doctor. The second feature provides for controls on use, monitored care a with capitation agreement and the third provides for preventive care and wellness programs where the quality of care is chosen as a part of HMO membership. Michael L. Glassman, the defendants' expert opined that an HMO market did not exist but rather a health care financing market existed of which the HMO is a part. He did not believe the Wisconsin program which requires or mandates separate HMOs to state employees and Medicaid recipients was relevant nor was the separate capital structure for companies who are able to sell HMOs. He had not considered the separate regulations and laws relating to the

HMO believing them not to have made a difference in his opinion. From all of this the jury could have reasonably determined that an HMO is a distinct and unique form of health care financing for which a relevant product market exists.

Some limited interchangeability exists in the health care financing market particularly between HMOs and PPOs and between HMOs and indemnity insurance when a monopoly raises the cost of HMOs. Richard A. Posner in *Antitrust Law, An Economic Perspective*, 127–128 (1976) explained how monopoly prices can make poor substitutes appear interchangeable to the consumer. "In the leading case of *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (the cellophane monopolization case), the Supreme Court stated that the 'market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.' " *Id.* at 127. The cellophane formulation is deficient in that it

> fails to specify the price level at which the products alleged to comprise the relevant market are reasonably interchangeable.... At a high enough price even poor substitutes look good to the consumer.... In *du Pont* the issue was whether the defendants had monopoly power, and in that setting it was vital to specify whether cellophane and other flexible wrapping material were reasonably interchangeable at the *current* price of cellophane which might be a monopoly price, or at the *competitive* price (i.e., cost) of cellophane. Reasonable interchangeability at the current price but not at a competitive price level, far from demonstrating absence of monopoly power, might well be a symptom of that power; this elementary point was completely overlooked by the Court.

*Id.* at 127–128. Thus, HMOs may be interchangeable with indemnity insurance when they are priced at monopolistic levels, as is Security HMO, but are considerably less expensive than indemnity insurance, and correspondingly less substitutable, in competitive markets. Considering this and the consumer's convenience and preference, the jury had legally sufficient evidence upon which it could find that the consumer expects to receive a unique and distinctive service from an HMO not either envisioned or provided by indemnity insurance, all at a lower cost.

Finally, Nohl testified to a geographical market which was described as a 20 to 30 minute drive time around those primary care doctors who are "the key since each person is to select one and all care is channeled through that primary care doctor. With that selection you have a relationship with the primary care doctor. A 20 to 30 minute drive around is basically the area that an HMO can operate."

The Court is well aware of the defendants' position relating to the HMO Market and has examined among others the following cases: *Ball Memorial Hosp., Inc. v. Mutual Hosp. Insurance Inc.*, 784 F.2d 1325, 1334–1336 (7th Cir.1986); *Tunis Brothers Co. v. Ford Motor Co.*, 952 F.2d 715 (3d Cir.1991); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589 (1st Cir.1993) as well as *Morgenstern v. Wilson*, 29 F.3d 1291 (8th Cir.1994).

The Court then concludes that this is not the case referred to in *Morgenstern* described as "when an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Id.* at 1297.

Here there was not that evidence that the HMO services failed to occupy a relevant product and geographical market, only the argument from Glassman that plaintiffs had not provided enough such evidence and that he had not considered those criteria which were utilized.

The Court further notes that the plaintiffs' expert witness on damages, John Beyer, testified that Compcare was foreclosed from the core areas of Marshfield Clinic's service area from selling Compcare HMO Products and his opinion considering HMOs as a separate market is stated as follows: "If you mean by separate market defining it as a separate relevant product market in an antitrust setting as we heard in the prior phase of this trial, the answer is no." (Tr. at 2583.) His

testimony specifically related however to two distinct primary markets. The Greater Marshfield Health Plan which operates in the counties of Wood, Jackson, Clark, western part of Marathon, Taylor, Rusk and to a certain extent Sawyer and the Northcare Plan in the counties of Oneida, Vilas, Iron, Ashland and part of Lincoln where Security has 100% enrollment in five of the above counties. (Exhibit 934, attached)

■ Similarly, plaintiff Compcare's essential facility claim is supported by the evidence. A monopolist's refusal to deal is governed by the "essential facilities doctrine." *MCI Communications Co. v. AT & T Co.,* 708 F.2d 1081, 1132 (7th Cir.1983).

"Such a refusal may be unlawful because a monopolist's control of an essential facility can extend monopoly power from one stage of production to another, and from one market into another. Thus, the antitrust laws have imposed on firms controlling an essential facility the obligation to make the facility available on non-discriminatory terms.

The case law sets forth four elements necessary to establish liability under the essential facilities doctrine: (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility.

*Id.* at 1132–1133. To be essential, a " 'facility need not be indispensable; it is sufficient if duplication of the facility would be economically infeasible and if denial of its use inflicts a severe handicap on potential market entrants.'" *Fishman v. Estate of Wirtz,* 807 F.2d 520, 539 (7th Cir.1986) (citations omitted.), *accord, MCI,* 708 F.2d at 1148.

■ Defendants challenge Compcare's essential facility claim by stating that the Marshfield doctors are not an essential facility because Nohl testified that POS plans are in the HMO product market and plaintiffs have established a POS plan in areas surrounding Marshfield. That plaintiff established a small POS plan in surrounding areas does not change the fact that the jury could reasonably find that Compcare could not establish a competing. HMO in Marshfield. Moreover, there was evidence that Blue Cross could not duplicate the network of doctors. It was difficult to recruit rural doctors. (Tr. at 540.) Obtaining new doctors or contracting with existing doctors was handicapped by Marshfield's monopolistic tactics, (Tr. at 480), and Marshfield's control of hospital privileges. (Tr. 358–363, 399–401.) Defendants' business justifications for refusing to deal with plaintiffs are refuted by evidence of Marshfield's blanket policy of not entering contracts with other HMOs. (Exhibit 1426.) It was for the jury to decide if Marshfield offered its facility on reasonable grounds. A reasonable jury could have found it was feasible for Marshfield to offer its doctors to Compcare to form an HMO because Marshfield made physicians available to Security and NCHPP, (Tr. at 983–984), and other clinics have contracts with multiple HMOs. (Tr. at 1770.)

■ Plaintiffs also provided sufficient evidence from which a reasonable jury could have found that plaintiffs suffered antitrust injury. Defendants claim that Blue Cross did not prove it suffered antitrust injury because Blue Cross did not produce evidence that it paid a supra-competitive price, rather Blue Cross only presented evidence that it paid higher than average prices. Defendants claim that higher than average prices are not necessarily the same as supra-competitive prices because of factors like quality and investment. Defendants, however, are wrong. There was sufficient evidence from which a reasonable jury could find Blue Cross paid a supra-competitive price. Blue Cross paid charges to Marshfield that were 10% above the UCR. (Tr. at 127.) In a market basket study, the City of Marshfield's charges were the highest of 23 cities in the state. (Tr. at 160–170.) This was sufficient for the jury to infer the charges were supra-competitive. Antitrust injury may be proved by inference or circumstantial evidence. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969). Moreover supra-competitive prices are prices that are higher than those Blue Cross would have paid in the absence of defendants' anti-competitive con-

duct and plaintiffs produced this type of evidence.

■ Similarly, Blue Cross has standing as a purchaser of physician services. This issue has been resolved in this Court's Order Denying Defendants' Motion for Summary Judgment.

■ Plaintiffs also produced sufficient evidence defining the other relevant markets. The relevant market must be ascertained in order to determine whether other sellers exist whose competition may limit defendants' monopoly power. *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). A relevant geographic market is "the set of sellers to which a set of buyers can turn for supplies at existing or slightly higher prices." *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1403 (7th Cir.1989). In a case involving health care, the relevant market must reflect actual patient and physician practices. *SmithKline Corp. v. Eli Lilly & Co.*, 427 F.Supp. 1089, 1117–18 (E.D.Pa.1976), *aff'd*, 575 F.2d 1056 (3rd Cir.1978), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). Delineation of the relevant market is for the trier of fact. *Fishman v. Wirtz*, 807 F.2d 520, 531 (7th Cir.1986).

■ Defendants first challenge the sufficiency of the geographic definition of the market for specialty care, claiming that the geographic market for specialty care includes Minnesota and plaintiffs' expert, Greenberg, erred in leaving it out. Defendants cite to *Morgenstern v. Wilson*, 29 F.3d 1291 (8th Cir.1994) for support. Greenberg did consider Minnesota, (Tr. at 813), but did not include it in the market. He explained that certain communities on the edge of a market can be in two relevant markets. (Tr. at 815.) The jury was entitled to accept this explanation. Plaintiffs distinguish *Morgenstern*, which found the jury's definition of the relevant market to be in error because it left out a city only 50 miles from the defendants' location, because Minnesota providers are close to the state border, but far from Marshfield. Duluth, the Twin Cities, and Rochester are 217, 166–200 & 160 miles away from Marshfield.

Second, defendants challenge the geographic definition of the primary and pediatric care markets because they overlap and allegedly ignore competing sellers. Plaintiffs' expert, Greenberg, considered the relevant factors: the area defendants targeted, (Tr. at 734), used economic and statistical tests including Elzinger Hogarty, (Tr. at 737), and economic literature which indicates a 30 mile radius for primary care. (Tr. at 737.) Greenberg explained to the jury how markets can overlap. (Tr. at 804–805.) The jury was entitled to embrace his opinion.

Third, defendants challenge the product market for specialty care asserting that there is no evidence that services in DRGs are good substitutes. Defendants claim that DRGs are merely hospital fee codes. A relevant product market is composed of products or services that are reasonably interchangeable for the purpose for which they are produced. *du Pont*, 351 U.S. at 404, 76 S.Ct. at 1012. DRGs are a system developed by health economists and used by the federal and state governments and insurance carriers. (Tr. at 730–731.) A jury could reasonably rely on this evidence.

■ Plaintiffs also provided sufficient evidence from which the jury could find that defendants possessed monopoly power. In some cases, a firm's share of the relevant market indicates market power because market share may reflect a firm's ability to reduce the total output in the market and so raise prices. *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins.*, 784 F.2d 1325, 1336 (7th Cir.1986). Part of proving market power is proving barriers to entry. Unless barriers to entry prevent rivals from entering the market at the same cost of production, even a very large market share does not establish market power. *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 672 (7th Cir. 1985). The lower the barriers to entry, and the shorter the lags of new entry, the less power existing firms have to raise prices. When the supply is highly elastic, existing market share does not signify power. *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins. Inc.*, 784 F.2d 1325, 1335 (7th Cir.1986).

Defendants have not challenged the existence of monopoly power for HMO services.[1] Defendants do, however, challenge the jury's finding of monopoly power in other relevant markets. Defendants assert that no barriers to entry existed because a study demonstrated actual entry of new non-Marshfield doctors into the area. The jury could reasonably have disregarded this evidence because the study counted Marshfield-affiliated doctors as independent doctors, not as Marshfield doctors. (Tr. at 2165.) The study was also statistically flawed. (Tr. at 2291, 2293–2296.) There was ample evidence from which a reasonable jury could have found barriers to entry. It is customary in rural practice to provide cross-coverage. (Tr. at 553, 588.) Marshfield denied cross-coverage to competitors. (Tr. at 501, 526, 463, 353, 397, 480.) Without cross-coverage a doctor must hire temporary doctors known as *locum tenens.* (Tr. at 515–516, 2243–2244, 2267.) This is a significant cost that Marshfield does not incur and is not incurred in other parts of the state. Marshfield also denied and restricted the hospital staff privileges of competitors. (Tr. at 358–363, 399–407.) Lastly, plaintiffs' expert, Greenberg, testified that there were barriers to entry.

■ Defendants also challenge the inclusion of Marshfield affiliated doctors within defendants' percentage of the market share. Plaintiffs presented sufficient evidence that would justify a jury adding the number of affiliated doctors to defendants' market share. The affiliation contracts are renewable or may be terminated on an annual basis. (Ex. 1444.) The Clinic expects the affiliates to refer non-Security patients to Marshfield, (Tr. at 1030, 1721), and they do, (Tr. at 1030), in a greater volume than non-Security patients. (Ex. 1454, 1841, 1704.) Plaintiffs also presented evidence that price competition between the affiliates and Marshfield is controlled by Marshfield. Marshfield obtains the fee schedules of its affiliates and approves or disapproves them. (Tr. at 1021, 1023.) Marshfield has also allocated markets

and territory with affiliated providers, Rhinelander Medical Center and Wausau Medical Center. (Tr. at 865–868, 870–871.) Lastly, plaintiffs' expert testified as to why affiliated providers are included in defendants' market share. (Tr. at 750–752.)

■ Similarly there was sufficient evidence from which a reasonable jury could find that defendants engaged in anticompetitive conduct. Anti-competitive conduct is defined as the willful acquisition or maintenance of monopoly power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 596, n. 19, 105 S.Ct. 2847, 2853, n. 19, 86 L.Ed.2d 467 (1985); *Olympia Equip. Leasing v. Western Union Telegraph,* 797 F.2d 370, 373 (7th Cir.1986). In this context willful means conduct designed to maintain or enhance monopoly power improperly. *Olympia,* 797 F.2d at 373. A monopoly like any other competitor, "is permitted and indeed encouraged to compete aggressively on the merits." *Id.* at 375. Improper conduct is conduct characterized as "exclusionary", "anti-competitive" or "predatory". *Aspen Skiing Co. v. Aspen Highlands Skiing Co.,* 472 U.S. 585, 602, 105 S.Ct. 2847, 2857. In determining whether conduct is exclusionary "it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way." *Id.* at 605, 105 S.Ct. at 2858. If a firm has been "attempting to exclude rivals on some basis other than efficiency," it is fair to characterize its behavior as predatory. *Id.* It is also relevant to consider its impact on antitrust defendants and rivals. *Id.* "Thus, 'exclusionary' comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Id.* at 605, n. 32, 105 S.Ct. at 2858, n. 32.

---

1. The Court notes that defendants' market share in the primary care market in some areas exceeds defendants' market share in the HMO services market. However, this issue is resolved by the damages award because plaintiffs' expert, Dr.

Beyer, calculated Compcare's exclusion damages only in those areas in which defendants had market power for HMOs, smaller areas than the primary care markets.

■ Defendants assert that there was no evidence of anticompetitive conduct because all defendants' actions have a legitimate business justification and lack anti-competitive intent. There is abundant evidence in the record from which a reasonable jury could find anti-competitive conduct. In the face of direct evidence that defendants acted with the specific intent to restrict competition, the jury was entitled to disregard defendants' alternative explanations. For example, clinics were acquired to threaten competitors. (Tr. at 531–533.) Security affiliation was used to threaten doctors and to force compliance with referral policies. (Tr. at 445–447.) Defendants warned potential new entrants that cross-coverage would be denied because they were competitors, (Tr. at 489), and hospital privileges were denied to competitors. (Tr. 360–363.) These actions excluded competitors from the market and resulted in supra-competitive prices for physician services and HMOs.

■ Plaintiffs' claim for attempted monopolization, however, must fail. First defendants allege that plaintiffs did not produce any evidence of intentional predatory conduct or dangerous probability of success. These challenges are meritless. However, defendants argue that the Special Verdict was inconsistent because Question 4 asked whether defendants attempted to monopolize in any relevant market in which they do *not* possess monopoly power. Defendants claim that given this finding there can be no finding of antitrust injury because the Court defined antitrust injury as paying supra-competitive prices and exclusion from competition and the definition of monopoly power is the power to control price or exclude competition. According to defendants, by definition defendants must possess market power in order to cause plaintiffs' antitrust injury.

The Special Verdict does contain an inconsistency. The jury found all the relevant markets to exist in Question 1. In Question 2 the jury answered "yes" to the question, "Do the defendants possess monopoly power in any relevant market you found to exist?" In Question 4 the jury answered "yes" to "Have defendants attempted to monopolize in any relevant market in which they do not

possess monopoly power?". The Court finds that the jury found monopoly power in all relevant markets. Plaintiffs in response to defendants' challenge do not list any markets in which defendants may not have possessed market power. Because defendants possessed monopoly power in all relevant markets asserted by plaintiffs, the answer to Question 4 cannot stand. The Court finds for defendants as a matter of law on Question 4, the attempt to monopolize claim.

Attempted monopolization customarily provides a cause of action when a plaintiff fails to prove monopoly power. A plaintiff may also attempt to monopolize in a market in which at first it does not possess monopoly power, but later succeeds in attaining monopoly power. Of course a defendant by definition attempts to do what it ultimately succeeds in doing, especially if the heightened intent requirement is met. Although plaintiffs meet the other requirements of a cause of action for attempted monopolization, given the wording of the question the cause of action for attempt in this instance must fail. This is of little significance because it does not affect the relief provided by the jury (damages) or by the court (equitable relief).

■ Defendants err in their contentions that plaintiffs did not suffer antitrust injury. Plaintiffs suffered antitrust injury for damages by paying supra-competitive prices and being excluded from the marketplace. Plaintiffs also suffered antitrust injury for injunctive relief because of the *threat* of continuing to pay supra-competitive prices and being excluded from the market in the future. Section 16 of the Clayton Act provides in part that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws." Sections 4 (the damages antitrust injury statute) and 16 of the Clayton Act "are thus best understood as providing complementary remedies for a single set of injuries." *Cargill, Inc. v. Monfort of Co., Inc.*, 479 U.S. 104, 113, 107 S.Ct. 484, 491, 93 L.Ed.2d 427 (1986). Sections 16 and 4 differ in certain ways. Section 4 requires a plaintiff to show actual injury, but section 16 only requires plaintiff to show "threatened" loss

or damage. *Id.* Section 16 requires plaintiff to show a threatened injury for which it would be entitled to compensation if the injury actually occurred. *Id.* at 112, 107 S.Ct. at 490. Consequently plaintiff must allege threatened antitrust injury damage or loss "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 113, 107 S.Ct. at 491.

There was sufficient evidence from which the jury could find that defendants conspired to monopolize. Defendants claim that plaintiffs did not prove a conspiracy to monopolize because they failed to rebut defendants' evidence of business justification for its predatory conduct, because there was no antitrust injury, and because plaintiffs did not connect the conspiracy with a specific market or impact. However, plaintiffs did provide sufficient evidence from which a jury could find that defendants conspired to monopolize. There was evidence that defendants conspired to control the Rice Clinic and does control the Rice Clinic through a management services contract, (Tr. at 1092–1093), and that defendants conspired with the Gunderson Clinic to monopolize HMO services. (Tr. 1093–1094.)

Plaintiffs have also provided sufficient evidence from which the jury could find violations of section 1 of the Sherman Act for questions 6, 7, and 8 of the Special Verdict. Question 6 of the Special Verdict asked the jury whether defendants "entered into a contract, combination or conspiracy the purpose of which or predictable effect was to unreasonably restrain trade in any relevant market." Question 7 asked whether defendants engaged in four specific actions which are per se violations of the Sherman Act, (1) allocating customers, (2) allocating territory, (3) allocating product or service markets, or (4) fixing fees or prices. Question 8 asked whether the purpose or predictable effect of these four actions was to unreasonably restrain trade. Question 6 was provided on the Special Verdict to include any section 1 violations that were not specifically enumerated as per se violations in Question 7 as well as encompassing those violations specifically enumerated in Question 7. Question 7 lists

the actions which this Court held to be per se violations of section 1 in its Memorandum and Order Denying Plaintiffs' Motion for Summary Judgment. Question 8 applied the Rule of Reason and Joint Venture analysis to the per se violations in compliance with the Seventh Circuit's direction that a Rule of Reason analysis also be applied to per se violations in case courts differ on whether violations deserve per se treatment or Rule of Reason treatment because of the uncertain state of the law. *See General Leaseways Inc. v. National Truck Leasing Ass'n.,* 744 F.2d 588, 596 (7th Cir.1984).

 There is sufficient evidence in the record of violations of section 1. For example, there was evidence that Marshfield allocated markets and territory with Rhinelander Medical Center, Wausau area physicians and NCHPP. (Tr. at 865–868, 870–871.) There was evidence that Marshfield allocated outpatient and urgent care services with the Ministry Corporation. (Tr. at 927–929.) There was evidence of price-fixing between Marshfield and its affiliated providers. The affiliated providers had only one fee schedule for both Security and non-Security patients, (Tr. at 887–889), and Marshfield approved or disapproved it. (Tr. at 887–889.) This is not a straight buyer-seller relationship, it is a relationship of competing sellers. Additional evidence suggested that although HMOs generally pay 20–40% less than list price for physician services, (Tr. at 2308), Marshfield Clinic approved those prices at 100% of list. (Tr. at 868–870.) This price fixing resulted in supra-competitive prices in the Marshfield area. (Tr. at 127, 169.) The overall effects of these practices were supra-competitive prices and elimination or reduction of competition. For example, the agreement between Marshfield and Rhinelander Medical Center to sign up with only one HMO, Security, and to drop NCHPP reduced competition. (Tr. at 712–713.) The contract with Wausau Medical Center which states that it cannot contract with other HMOs reduced competition. (Tr. at 1361.)

Contrary to defendants' contentions, it was the duty of the jury to weigh the evidence and balance the anti and pro competitive effects of the agreements at issue. The jury

was properly instructed on both the Rule of Reason analysis and joint venture analysis. The role of the Court in a Rule 50 motion is not to reweigh the evidence, *Dombeck v. Milwaukee Valve Co.*, 823 F.Supp. 1475, 1477–78 (W.D.Wis.1993), but to search the record for evidence of detrimental effects on competition. As stated above such evidence exists.

### RULE 59, NEW TRIAL

■ When addressing defendants' motion for a new trial pursuant to Rule 59 the Court must consider whether the verdict is against the weight of the evidence, damages are excessive or trial is not fair to the moving party. *Forrester v. White*, 846 F.2d 29 (7th Cir.1988)

Defendants claim they are entitled to a new trial on various other grounds to include the Court's failure to exclude the testimony of Jeffrey Nohl as an expert, the declination to give a statute of limitations instruction, improper instructions on plaintiffs' tying claims and that plaintiffs' evidence did not support their claim for lost profits.

■ The tying instructions provided by the Court were appropriate and necessary based upon the evidence presented. The statute of limitations instruction was provided in the damage phase of the trial as requested. The Court has also determined that Jeffrey Nohl with his 10 years experience in the HMO market but without the credentials of academia, a Phi Beta Kappa key or a price tag in excess of $400,000.00 was nonetheless recognized as a witness by Rule 702 of the Federal Rules of Evid. The jury considered his experience and common sense discussion of the HMO market and regardless of the fact that he had not examined *Tunis* and believed a Buick was a separate product market, his testimony assisted the jury notwithstanding the complexity of this case.

■ If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. The standard instruction provided the jury with the necessary guidance for considering his testimony. Nohl's opinion was apparently accepted by the jury and as difficult as it may be for defendants to accept, the relevant product and geographical limits apparently were understood and found to exist. It was not error for Nohl to testify.

### DAMAGES

■ Defendants are correct that the evidence does not support plaintiffs' claims for damages.

Dr. Christenson testified that Blue Cross paid Marshfield Clinic over the past 6 years in the range of 25 to 30 million dollars. He further testified that had the Marshfield Clinic charged the average fee of other physicians in the state of Wisconsin Blue Cross would have paid significantly less, "by approximately 35% of the total reimbursement to Marshfield." Magically, based upon plaintiffs' argument the jury determined that $10,500,000 would fairly and reasonably compensate plaintiff Blue Cross for any antitrust injury which it sustained on or after February 16, 1988 which is the direct result of defendants' conduct in violation of the antitrust laws. None of the Christenson testimony relates to any relevant market found by the jury to exist, nor to any of the exhibits to which he referred.

More appropriately, Beyer addressed the overcharge fees in the context of the previously identified markets testifying that $813,222.00 would be attributed to the primary care market, $66,958.00 attributed to the pediatric market and $205,897.00 attributed to the specialty care market for a total of $1,085,897.00.

When compared to the offhand opinion of Christenson based upon no evidence in the record the $1,085,897.00 does not appear excessive. In contrast, the $10,500,000.00 is monstrously excessive. Dr. Beyer did attribute a portion of the overcharges, $491,014.00, to the ASO and Cost Plus contracts providing the jury an opportunity to select a lower damage figure of $594,833.00 which it did as shown by its response to Question 2 of the

damage verdict. In any event Beyer. declined to make those reductions stating, "In my judgment I thought that would be appropriate partly because it increased the number of and the amount of information that could be used or drawn upon for comparing the prices of physicians in these two different benchmark areas and also because, based on several sources of information, there was no reason to believe that there would be any significant differentiation by geographic area of these types of insurance, ASO and cost-plus throughout Wisconsin. There was no reason to exclude it and good reason to include it." (Tr. at 2595.)

The defendants' damage expert Mark Abernathy, however, did indeed provide those good reasons which the jury apparently accepted. "The ASO contract is a contract with an employer group simply to administer the claims for that particular employer group. And if the employer group wishes to cap his risk, then you can arrange for stop-loss insurance. The employer group bears the risk of loss. In an administrative service contract (ASO), you're simply processing claims for patients having health care and charging the fee for processing those claims. It's my opinion that it would be inappropriate to include ASO and self-insured contracts to damages calculations to Blue Cross/Blue Shield simply because Blue Cross/Blue Shield passes the claims through to the employer, they don't bear the expense of the claim."

 Initially a plaintiff in an antitrust action has the burden to prove the fact of the injury—that defendants' conduct was a material cause of some injury to plaintiff's business. Once plaintiffs have established the fact of injury the burden of proving the amount of damages is more relaxed. *Moore v. Boating Industry Assoc.*, 754 F.2d 698, 717 (7th Cir.1985) *vacated on other grounds,* 474 U.S. 895, 106 S.Ct. 218, 88 L.Ed.2d 218 (1985). Once causation of damages in an antitrust case has been established the *amount* of damages may be determined by a "just and reasonable estimate." *MCI Communications Corp. v. AT & T,* 708 F.2d 1081, 1161 (7th Cir.1983). Since the Supreme Court has allowed for some measure of un-

certainty in the calculation of antitrust damages, strict proof of which damages have been caused by which acts has not been required. *Id.* The Seventh Circuit, however, went on to hold that a damage award must reflect only those losses directly attributable to unlawful competition. *Id.* at 1161. The court in *MCI* ordered a new trial on damages because the damage study relied on by the jury in its damage award did not subtract those damages attributable to lawful competition. Nor was the jury provided with a methodology to reduce the amount of damages by the amount of lawful conduct. The Court noted the distinction between proof of causation of damages and proof of an amount of damages and reasoned that courts have been consistent in requiring plaintiffs to prove in a reasonable manner the link between the injury suffered and the *illegal* practices of the defendant.

A remittitur is appropriate in the case at bar even in light of the lower burden on a plaintiff in an antitrust action to prove the *amount* of damages. The damage award is clearly excessive, totally monstrous, contrary to the evidence presented at trial and based on a figure lacking adequate foundation. The error in the damage award to *Blue Cross* is somewhat analogous to the error in the damage award in *MCI.* The damage award to *Blue Cross* lacks testimony relating to the relevant markets and those markets in which defendants had market power. Without this information there is no casual link between essential elements of the cause of action and the damage award. Defendants are liable only for those damages directly caused by their illegal conduct. They are not liable for a percentage of all payments made to them by Blue Cross. Such an amount could reflect payments that are not the result of defendants' illegal conduct. Testimony relating overcharges to the relevant markets and the markets in which defendants had monopoly power is necessary to prove that those are the damages caused by illegal conduct. Such a requirement is not too onerous because plaintiff presented testimony relating damages to the relevant markets via Dr. Beyer.

As precise as Dr. Beyer was in addressing the overcharge damages to which Blue Cross/Blue Shield was entitled he was somewhat speculative in his approach when assessing those damages to be provided to plaintiff Compcare as a result of the defendants' foreclosure of HMO services to plaintiffs. He testified that an amount of damage in the Greater Marshfield area would be somewhere between 3.1 to 4.9 million dollars. He justified the higher amount based upon that evidence which demonstrated a cost shifting by the defendants. Evidence was provided in the testimony of Dwight Ruff and those memos to which he referred that Marshfield had the desire to minimize profits in its HMO because of its public and regulative nature. Defendants were obviously and admittedly in a position to set the capitation rate at any level in order to show profits in one entity or the other. Its actual numbers generally showed a large increase in the capitation rate in 1993 which skewed the profits from about 50/50 to substantially in the clinic's favor. The 1993 capitation rate increase was about $8.00 yet the amounts added by Beyer for the cost shift was only $2.00 and $4.00. This amount seems likely to be less than the actual cost shift. Furthermore, the approximately one million dollar projected annual profit, even with the cost shift, is less than 20% of the average annual profit which Marshfield was realizing from its HMO. Although Beyer's estimate of the amount of cost shift may be speculative it was necessarily so because the information which went into that shift is exclusively within Marshfield's knowledge and is difficult to discern from available records. In conclusion under all of the circumstances the amount of lost HMO profits testified to by Beyer and accepted by the jury cannot be judged unreasonable.

While speculative in part the computation of HMO lost profits generally addresses a conservative approach and does not produce an unreasonably high result. Granting a remittitur is necessary because the jury added to Compcare's lost profits of $5,056,277.00 the amount of over charge damages in the amount of $594,883.00 which should have been awarded to Blue Cross at Question 1. (Exhibit 10413, attached) Accordingly the amount as found by the jury, $5,669,277.00 shall be reduced by said amount.

"For years we have been saying, without much visible effect, that people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence. *Post hoc ergo propter hoc* will not do; nor the enduing of simplistic extrapolation and childish arithmetic with the appearance of authority by hiring a professor to mouth damages theories that make a joke of the concept of expert knowledge." *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415–416 (7th Cir.1992) (Citations omitted).

This Court has determined that the defendants are entitled to a new trial on damages because they are monstrously excessive based upon that legally sufficient evidence which the jury failed to consider.

Accordingly, a remittitur will be entered where defendants are granted a new trial subject to an award of $594,883.00 to plaintiff Blue Cross and Blue Shield United of Wisconsin and $5,074,394.00 to plaintiff Compcare Health Services Insurance Corporation, amounts to be trebled by the Court. In the event plaintiffs fail to accept the remittitur set forth herein on or before April 3, 1995, a new trial on damages will be scheduled.

### EQUITABLE RELIEF

Plaintiffs have requested broad, far-reaching equitable relief. Defendants have responded by denying the need for any injunctive relief or for limited injunctive relief in the alternative.

Section 16 of the Clayton Act provides:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damages is granted by courts of equity, under the rules governing such proceedings....

It is plaintiffs' burden to prove they are entitled to injunctive relief. *Wilk v. American Medical Ass'n.*, 895 F.2d 352, 366–367 (7th Cir.1990). To be entitled to equitable relief plaintiffs must demonstrate (1) antitrust injury, (2) that no adequate remedy at law exists, and (3) that the balance of hardships favors the imposition of equitable relief. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 114, 107 S.Ct. 484, 491, 93 L.Ed.2d 427 (1986); *Wilk*, 895 F.2d at 370. Traditional principles of equity apply under section 16. *Id.* Equitable relief is discretionary and not automatically available to an injured plaintiff. *Id.* The sole function of an action for injunction is to forestall future violations. *U.S. v. Oregon State Medical Soc.*, 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952). It is unrelated to punishment or reparation. *Id.* A threat of future violation or contemporary violation of a nature likely to continue or recur is necessary for injunctive relief. *Id.; Wilk*, 895 F.2d at 367. Section 16 should be construed and applied with the purpose of enforcing the antitrust laws and with the knowledge that the remedy it affords, like other equitable remedies is "flexible and capable of nice 'adjustment and reconciliation between the public interest and private needs as well as between competing private claims.'" *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 131, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969).

Instead of considering those post trial affidavits and other related documents, the Court refers to the record as stated earlier for that relief which should be addressed. The following testimony of Glassman is a part of that evidence which a court of equity should consider when granting injunctive and declaratory relief.

> My 4th conclusion is that if Marshfield Clinic is forced to do business in the fashion desired by Blue Cross and Compcare that competition will be harmed and that the consumers of Central and North Central Wisconsin will be left worse off because of that.

■ The first requirement for injunctive relief, antitrust injury, clearly exists and has been previously addressed in this Memorandum, this Court's Memorandum and Order Denying Defendants' Motion for Summary Judgment, and in the Special Verdict. As for the second requirement, that there be no adequate remedy at law because of a threat of future violations, plaintiffs have argued that defendants have not admitted any wrongdoing and in fact vehemently deny their actions in any way violate the antitrust laws. To be considered in this analysis are the bonafides of the expressed intent to comply with the antitrust laws, the effectiveness of the discontinuance of the violations of the law and in some cases the character of the past violations. *Wilk*, 895 F.2d at 367. The court in *Wilk* considered as a factor in support of an injunction the failure of the defendant AMA to ever acknowledge that its practice of discriminating against osteopaths was illegal. Here, the monetary relief has been found adequate to provide relief to plaintiffs for the pecuniary loss they have already sustained and will sustain. The reasoned and substantial award of damages is likely to motivate defendants to change their behavior. Defendants, however, continue to deny any wrongdoing. Consequently, there is a threat that defendants will continue to violate the antitrust laws. The third element, balancing the hardships, (referred to by Glassman among others at trial) has been analyzed separately according to each type of injunctive relief requested.

Plaintiffs suffered two forms of antitrust injury as a result of defendants' violation of the antitrust laws, paying supra-competitive prices and Compcare's exclusion from the HMO market. Plaintiffs request equitable relief to restore competitive pricing for medical services in the relevant markets to ensure against future supra competitive prices. Plaintiffs also request equitable relief to allow Compcare to enter the HMO services market by guaranteeing access to Marshfield physicians to form an HMO and request that Marshfield be divested of its subsidiary, Security.

■ Plaintiffs request the divestiture of the Lakeland and Flambeau Clinics from the Marshfield Clinic. A court may order divestiture as part of injunctive relief in an action between private parties in suits under section 16. *California v. American Stores*

**1264**

*Co.,* 495 U.S. 271, 295, 110 S.Ct. 1853, 1866, 109 L.Ed.2d 240 (1990). However this does not mean that such power should be exercised in every situation in which the Government would be entitled to relief under section 15. Plaintiffs in their Trial Brief in Support of Injunctive Relief did not cite to a single case in which *retroactive* divestiture was awarded in a *private* section 1 or 2 case. The only case cited was *International Travel Arrangers v. NWA, Inc.,* 723 F.Supp. 141 (D.Minn.1989), *aff'd.,* 991 F.2d 1389 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 345, 126 L.Ed.2d 309 (1993) which stated in dicta that divestiture is available in private sections 1 and 2 suits. Divestiture has been awarded in section 7 cases in the context of proposed mergers and in cases brought by the government. "Potentially disruptive remedies such as divestiture of completed transactions involving integration of ongoing business activities have never been granted in private suits under section 7." *Glendora v. Gannett,* 858 F.Supp. 369, 372 (S.D.N.Y. 1994) *aff'd.* 40 F.3d 1238 (2nd Cir.1994). Indeed the Seventh Circuit upheld the district court's refusal to order defendants to divest the Bulls franchise as an equitable remedy for their illegal conduct in *Fishman v. Estate of Wirtz,* 807 F.2d 520 (7th Cir.1986).

It is questionable whether divestiture of a long completed transaction is an appropriate remedy in a private action under the Sherman Act. In any event it is not an appropriate remedy here. Divestiture of the Lakeland and Flambeau clinics would require Marshfield to sell its ownership interest in the former Lakeland Medical Center (which includes sale of physician practices in Minoqua/Woodruf, Park Falls, Phillips and Mercer) and in the Flambeau Medical Center Hospital. Less drastic remedies are available which are designed to halt anti-competitive conduct and agreements. Moreover the balance of equities does not favor divestiture. The Marshfield Clinic came into these areas at the request of local providers who requested Marshfield to preserve and expand the access to care. (Tr. at 1282–1290.) Divestiture would have a large impact on third parties such as patients, Marshfield doctors and others that have not been before this Court to protect their interests.

The next category of relief requested is to void and prohibit all contracts, combinations and conspiracies in restraint of trade. A court should enjoin the precise practices found to have violated the Act. *United States v. Grinnell Corp.,* 384 U.S. 563, 579, 86 S.Ct. 1698, 1708, 16 L.Ed.2d 778 (1966); *see U.S. v. Crescent Amusement Co.,* 323 U.S. 173, 188, 65 S.Ct. 254, 261, 89 L.Ed. 160 (1944) ("Civil suits under the Sherman Act would indeed be idle gestures if the injunction did not run against the continuance or resumption of the unlawful practice.) Injunctive relief should be fashioned to prevent the recurrence of the illegality which brought on the given litigation. *United States v. Loew's, Inc.,* 371 U.S. 38, 52, 83 S.Ct. 97, 105, 9 L.Ed.2d 11 (1962). To ensure that relief is effectual, otherwise permissible practices connected with the acts found to be illegal must sometimes be enjoined. *Id.,* at 53, 83 S.Ct. at 106.

Plaintiffs request that Marshfield and Security be enjoined from entering into or enforcing certain agreements with the Gunderson Clinic, Rice Clinic, Wausau area physicians, the North Central Health Protection Plan, and Rhinelander Medical Center concerning (1) administrative services, (2) administration of health plans, (3) allocation of customers, territories, product or service markets, (4) setting of fees or prices, (5) free flow agreements, and (6) marketing. These types of agreements have the effect of reducing competition. Prohibiting them is an appropriate remedy for a monopolist guilty of past anti-competitive conduct to reduce the threat that such anti-competitive conduct will continue. If defendants are involved in the supervision of a competitor where they have access to information that can help them reduce competition they can influence that provider to reduce competition. Thus supervision of competitors will be enjoined, but providing purely administrative services will not. If defendants are involved in the administration of the health plans of their competitors, they can reduce competition. Allocation of customers, territories, products or service markets are acts which are per se illegal as is price fixing. Defendants involvement with its competitors' marketing can

also limit competition but such limitation is not found to be necessary here.

For example, The Gunderson Clinic, located in LaCrosse, consists of 270–300 doctors, is one of the 5 largest medical group practices in Wisconsin and competes with Marshfield. There was reasonable evidence in the record from which the jury could find defendants conspired to monopolize by controlling the Gunderson Clinic. Marshfield has a contract to provide certain administrative services for Gunderson. (Tr. at 1094.)

The Rice Clinic, located in Stevens Point, is also one of defendants' competitors. There was reasonable evidence from which a jury could find that Marshfield conspired with the Rice Clinic to monopolize physician services. Marshfield engaged in negotiations to acquire Rice. (Tr. at 1092–1093.) Marshfield now has a management services contract with Rice. Marshfield serves as manager and where Rice requires administrative services it must ask Marshfield to provide it first. (Tr. at 1092.) This is the same type of agreement Marshfield had with Lakeland before Marshfield acquired it.

There was also sufficient evidence from which a jury could find that Marshfield and Wausau area physicians conspired to monopolize physician services. Marshfield and Wausau agreed not to enter competing agreements with other HMOs for their Security 65 HMO. (Tr. at 1361–1363.) Marshfield also attempted to purchase/affiliate with Wausau Medical Center. (Tr. at 1315–1316.) The North Central Health Protection Plan is an HMO operating with Wausau area physicians. There is evidence from which a jury could find that Marshfield and Security divided territory with NCHPP in violation of section 1. NCHPP can only be sold in certain areas and Security in others. The two plans market separately. (Tr. at 856–857.) The Rhinelander Medical Center uses NCHPP in Lincoln County only and uses Security in Oneida County only. (Tr. at 865–866, 870–871.)

Rhinelander Medical Center near Lakeland competes with Marshfield. (Tr. at 862.) It has about 30 doctors all of whom are either Marshfield doctors or affiliated with Security. (Tr. at 712–713.) There is evidence in the record from which a jury could find that Marshfield allocated territory with Rhinelander. (Tr. at 865–868, 870–871.) Marshfield warned Rhinelander about signing with more than one HMO. Rhinelander then cancelled NCHPP in Oneida county in favor of a relationship with Security. (Tr. at 712–713.) Rhinelander participates in NCHPP in Lincoln County and participates in Security in Oneida County only. (Tr. 865–866, 870–871.)

Defendants object to this relief on numerous grounds. They claim this would void beneficial agreements. While these agreements have some beneficial attributes, they tend to reduce competition. A monopolist found guilty of illegally conspiring with competitors to reduce competition simply should not be involved in the supervision of its competitors. Nor should a monopolist engage in a free flow agreement with a competitor because it reduces the chances that the competitors will expand into each other's markets. Fee setting and market allocation speak for themselves. The risks of anti-competitive conduct outweigh the limited benefits the agreements may provide. Defendants express concern that they will no longer be able to provide certain physician services that are needed in other areas. Nothing in this order prevents Marshfield from providing physician services for competitors.

■ Next, plaintiffs request that defendants be enjoined from entering into or enforcing any agreement which prohibits Marshfield physicians from providing cross-coverage. The jury was instructed that it could find liability only if it found barriers to entry in the relevant markets. The inability to obtain cross-coverage was considered to be a barrier to entry for independent physicians attempting to practice in the rural areas of the relevant markets. Contrary to customary rural practice Marshfield's policy was to refuse cross-coverage to independent physicians. (Tr. at 553, 588, 489, 500.) Marshfield in fact denied such cross-coverage. (Tr. 501, 526, 463, 353, 397, 480.) While defendants complain about the problems of insurance when providing cross-coverage for non-Marshfield physicians, any problem posed by liability coverage is out-

weighed by the need to lift barriers to entry for independent physicians in order to open the Marshfield market to competition.

 Plaintiffs request that defendants be enjoined from entering into or enforcing any non-compete or other exclusivity agreements which restrain the ability of physicians employed by Marshfield to practice in any location after terminating employment with the Marshfield Clinic. Marshfield employed doctors are currently required to sign non-compete contracts. (Tr. at 711.) Defendants assert that these agreements are required to protect their investment in recruiting and training physicians. Normally these agreements, if reasonable, are enforceable but when utilized by an illegal monopolist they are not justified. Prohibiting these agreements could help to open the relevant markets to competition. Defendants have asserted in opposing divestiture that many Marshfield doctors would leave the area without the support of Marshfield. If this is valid, defendants have no concerns because even in the absence of such restrictive covenants, Marshfield doctors will not leave.

 Plaintiffs further request that any agreements requiring referrals of patients by any physicians or other providers to the Marshfield Clinic or its physicians be prohibited. This practice created the illegal monopoly in specialty physician services and should cease. However, any agreements which require as part of the Security HMO that Marshfield physicians and physicians who are part of the Security HMO network refer Security HMO patients only to physicians that are part of the Security HMO are valid. Using a distinct panel of doctors is the very essence of an HMO. The practice is only anti-competitive when patients who are not a part of the Security HMO are referred exclusively to Marshfield Clinic. There is no justification for such an anti-competitive policy as requested by plaintiffs.

 Next plaintiffs request an injunction prohibiting defendants for a period of five years from entering into any agreement or understanding to acquire, administer or control any presently existing independent physician, physician group, clinic or hospital,

HMO except Security, or managed care network. Providing this relief as to the Gunderson Clinic, Rice Medical Center, Wausau Medical Center, and NCHPP should prevent defendants from expanding their monopoly and from further reducing competition by taking over competitors. There is a great risk that Marshfield will engage in such activity in the future because it has systematically taken over physician practices in the past. There is also evidence that it has attempted to control or acquire these clinics. (Tr. at 1094, 1092–1093, 1315–1316.) Any potential harm from this restriction is outweighed by the danger posed by Marshfield expanding its monopoly and forcing other potential competitors from the market. This does not prevent Marshfield from starting a new practice or entering competitive markets, so there is no danger that this injunction would harm an under-served area.

 Next plaintiffs request an injunction prohibiting defendants from comprising more than 30 percent of the number of physicians of any committee intended to review, recommend, approve or restrict privileges at any hospital or participating in any peer review process at any hospital. This request is harsh and its purpose may be accomplished by other means. Its purpose is to remove a barrier to independent physicians attempting to enter the market. The barrier is the inability of independent physicians to obtain approval for staff privileges at various hospitals where the credentialing committees were dominated by Marshfield doctors. There was evidence that Marshfield physicians restricted hospital privileges of competitors. (Tr. at 358–363, 399–401.) The injunctive relief which prohibits Marshfield from adopting any practice which limits hospital privileges of qualified doctors not employed by Marshfield is sufficient to accomplish this purpose.

 Plaintiffs request an injunction to prevent defendants from entering into any agreement, adopting any practice or attending any meeting with the Ministry Corporation or its representatives concerning (1) joint marketing; (2) ownership, control, administration or operation of any health care facility; (3) plan for regional development

health care; (4) recruitment; (5) allocation of territories, customers, products or services; (6) setting fees or prices and (7) service to be provided by Ministry Corporation Hospital to or for any health care insurer. Ministry corporation is involved in operating hospitals in the Marshfield area. Ministry and Marshfield have marketed certain specialty care items together and have engaged in joint planning where Ministry purchases certain equipment and Marshfield recruits the personnel to use it. Ministry and Marshfield are competitors for certain items such as outpatient surgery. There was evidence in the record from which a jury could find that Marshfield and the Ministry corporation allocated territory for outpatient care, emergency, or urgent care. (Tr. at 927–929.) Defendants have pointed to certain benefits such as cost savings that outweigh the potential risks to competition. However, in those areas in which they are competitors, they are enjoined from allocating territories, customers, products or services and from setting fees or prices. These activities are always illegal between competitors.

■ Defendants will be enjoined from entering into any agreement which affiliates any physician with Security Health Plan based in whole or part on whether such physician is employed by Marshfield or Rhinelander Medical Center. This will open competition and give independent physicians willing to be paid at the Security rate a chance to have more patients. This should not harm defendants because they are not ordered to affiliate with all interested physicians.

Plaintiffs also request an injunction prohibiting Marshfield from entering into any agreement which restricts the location at which a physician affiliated with Security Health Plan may provide services for which Security Health Plan will allow reimbursement. An HMO cannot have an unlimited number of affiliated physicians in different geographic areas. Having some reasonable limits on the number of physicians in an area allows an HMO to be cost effective. Limitations on where an affiliated physician may practice and receive reimbursement for HMO patients does not preclude that physi-

cian from seeing non-Security patients in other areas.

■ Finally, plaintiffs ask the Court to set price levels for defendants' services. Plaintiffs allege that this will force defendants to finally sell at a competitive price. This Court refuses to micro-manage the health care economy in North–Central Wisconsin and has provided reasonable injunctive relief. This relief is intended to open the market to competition and is crafted to allow the market to self-adjust to competitive pricing.

### ORDER

IT IS ORDERED that defendants' motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure, is GRANTED as to Question 4 of the Special Verdict and DENIED in all other respects.

IT IS FURTHER ORDERED that defendants' alternative motion for new trial on liability pursuant to Rule 59 of the Federal Rules of Civil Procedure is DENIED.

IT IS FURTHER ORDERED that defendants' motion for a new trial on damages is GRANTED unless the aforesaid remittitur is accepted by the plaintiffs as set forth herein.

IT IS FURTHER ORDERED that any acceptance of remittitur by the plaintiffs shall be trebled by the Court and amended judgment to include costs, reasonable attorneys fees and expenses shall be entered together with that injunctive relief which follows:

### I. *JURISDICTION*

This Court has jurisdiction over the parties and subject matter. Jurisdiction is retained by this Court for the term of this Order to enable any of the parties to this Order to apply to this Court at any time for the construction or implementation of the Order, for the enforcement or modification of any of its provisions and for sanctions for any violation thereof.

## II. *DEFINITIONS*

A. "Agreement" shall be broadly construed to include all agreements, understandings and contracts, whether written, oral or otherwise.

B. "Central and north central area" shall mean the following counties: Adams, Ashland, Barron, Bayfield, Buffalo, Burnett, Chippewa, Clark, Douglas, Dunn, Eau Claire, Florence, Forest, Iron, Jackson, Juneau, La Crosse, Langlade, Lincoln, Marathon, Monroe, Oneida, Pepin, Pierce, Polk, Portage, Price, Rusk, St. Croix, Sawyer, Shawano, Taylor, Trempelau, Vilas, Washburn, Waupaca, Waushara and Wood.

## III. *APPLICABILITY*

This final Order applies to each defendant and to each of the defendants' officers, board members, administrators, agents, servants, representatives, employees, successors, and assigns.

## IV. *VOID CERTAIN AGREEMENTS*

Defendants Marshfield Clinic and Security Health Plan are enjoined and restrained from directly or indirectly entering into or enforcing any of the following Agreements, understandings and other described actions and a Declaration is hereby made that such Agreements, understandings and described actions are void and of no effect, as follows:

A. Any agreements or understandings with the Gunderson Clinic concerning:

1. Supervision;

2. Administration of health plans;

3. Allocation of customers, territories, product or service markets;

4. Setting of fees or prices;

5. Free flow of health plan patients.

B. Any Agreements or understandings with the Rice Clinic concerning:

1. Supervision;

2. Administration of health plans;

3. Allocation of customers, territories, product or service markets;

4. Setting of fees or prices;

5. Free flow of health plan patients.

C. Any Agreements or understandings with Wausau area physicians concerning:

1. Supervision;

2. Administration of health plans;

3. Allocation of customers, territories, product or service markets;

4. Setting of fees or prices;

5. Free flow of health plan patients.

D. Any Agreements or understandings with North Central Health Protection Plan concerning:

1. Supervision;

2. Administration of health plans;

3. Allocation of customers, territories, product or service markets;

4. Setting of fees or prices; and

5. Free flow of health plan patients.

E. Any Agreements or understandings with Rhinelander Medical Center concerning:

1. Administration of health plans;

2. Allocation of customers, territories, product or service markets;

3. Setting of fees or prices;

4. Free flow of health plan patients.

F. Any Agreements or understandings which directly or indirectly limit, prohibit or tend to limit or prohibit Marshfield physicians from providing cross-coverage to non-Marshfield physicians.

G. Any Non–Compete or other Exclusivity Agreements or understandings which directly or indirectly prohibit or restrain the ability of a Marshfield employed physician from practicing in any location after terminating employment with the Marshfield Clinic.

H. Any Agreements or understandings requiring referrals of patients by any physicians or other provider to the Marshfield Clinic or its physicians except for Security HMO patients.

## V. *PROHIBITED CONDUCT*

Marshfield Clinic and Security Health Plan are enjoined and restrained for a period of three (3) years from the following:

A. Entering into any Agreement or understanding to directly or indirectly acquire,

supervise or control the Gunderson Clinic, the Rice Clinic, the Wausau area physicians and NCHPP.

B. Entering into any Agreement, having any policy, adopting any practice or procedure or providing an incentive of any type or kind which directly or indirectly may tend to in any way limit or prohibit cross-coverage of any physician not employed by the Marshfield Clinic;

C. Entering into any Agreement, having any policy, adopting any practice or procedure or providing an incentive of any type or kind which directly or indirectly may tend to prohibit or limit hospital privileges of any qualified physician not employed by Marshfield Clinic;

D. Entering into any Agreement, having any policy, adopting any practice or procedure or attending any meeting with the Ministry Corporation or its representatives concerning:

1. Allocation of territories, customers, products or services;

2. Setting of fees or prices.

E. Entering into any Agreement, having any policy, adopting any practice or procedure or providing an incentive of any kind which directly or indirectly affiliates any physician with the Security Health Plan based in whole or in part on whether such physician is employed by the Marshfield Clinic or Rhinelander Medical Center.

## VI. *EQUAL ACCESS*

A. The defendants Marshfield Clinic and Security are enjoined from discriminating against Blue Cross/Compcare in providing them access to its physicians, products and services for the purposes of establishing an HMO in the Greater Marshfield and Northcare areas.

B. The defendants Marshfield Clinic and Security are enjoined from charging supracompetitive prices for their services and products.

## VII. *COMPLIANCE PROGRAM*

Marshfield Clinic and Security Health Plan shall maintain an antitrust compliance program which shall include:

A. Distributing within thirty (30) days from the entry of this Order, a copy of this Order to all their respective officers, directors, trustees, administrators and employees.

B. Notifying the Marshfield Clinic and Security Health Plan officers, directors, trustees, administrators, employees, and affiliated physicians within thirty (30) days from the entry of this Order that they are not bound by any agreement described herein as void.

C. Distributing in a timely manner a copy of this Order to any successor corporation or person who succeeds to a position as officer, director, trustee, administrator, employee or affiliated physician.

D. Holding a briefing annually for all operating officers, directors, and administrators concerning the meaning and requirements of this Order.

E. Obtaining from each operating officer and administrator an annual, signed written certification pursuant to 28 U.S.C. § 1746 that he or she has: (1) read, understands and agrees to abide by this Order; (2) has been advised and understands that noncompliance with this Order may result in sanctions; and (3) is not aware of any violation of this Order.

F. Maintaining for inspection by plaintiffs a record of recipients to whom this Order has been distributed and from whom the certification required by Paragraph VII.E. has been obtained; and

G. Conducting an audit of its activities within sixty (60) days from the entry of this Order and annually thereafter to determine compliance with this Order.

## VIII. *CERTIFICATIONS*

A. Within thirty (30) days after the entry of this Order, each defendant shall certify to plaintiffs and the Court whether it has made the distribution of this Order and made the necessary notifications in accordance with Paragraph VII A. and VII B. herein.

B. For three (3) years after the entry of this Order, on or before its anniversary date, each defendant shall certify annually to plaintiffs whether defendants have complied with the provisions of Paragraph VII., Sections C, D, E, F and G.

## IX. *NOTICE AND PUBLICATION*

Marshfield Clinic and Security Health Plan shall provide by first class mail, postage prepaid, a copy of this Order to the following persons within thirty (30) days of the entry of this Order:

A. All physicians practicing in the central and north central Wisconsin area;

B. All hospitals located within the central and north central Wisconsin area;

C. All Security Health Plan affiliated physicians;

D. Rhinelander Medical Center;

E. Gunderson Clinic;

F. North Central Health Protection Plan;

G. Wausau Clinic;

H. Rice Clinic; and

I. Rice Lake Clinic.

## X. *EXPIRATION OF ORDER*

This Order shall expire three years from this date.

APPENDIX
EXHIBIT 984

## Dr. Greenberg's Primary Care Markets

**Market Areas**
- Chippewa Falls
- Rice Lake
- Greenwood
- Marshfield
- Mosinee
- Minocqua
- Park Falls
- Stanley
- Colby
- Mercer
- Stratford
- Phillips
- Ladysmith

Source: Report of Warren Greenberg, Exhibit 6

## EXHIBIT 010413

### Summary of Damages Incurred by Blue Cross and Compcare

| | Damages Due to Higher Physician Fees (Based on Indemnity Payments Only) | Damages Due to Foreclosure into GMHP Area | Damages Due to Foreclosure into Northcare Area | Total Damages |
|---|---|---|---|---|
| | ----------------------------(dollars)---------------------------- | | | |
| 1988 | $69,092 | -- | -- | $69,092 |
| 1989 | 179,726 | -- | -- | 179,726 |
| 1990 | 113,462 | (150,000) | -- | (36,538) |
| 1991 | 89,766 | 127,500 | (25,500) | 191,766 |
| 1992 | 85,557 | 617,571 | (15,431) | 687,697 |
| 1993 | 57,280 | 367,570 | 80,875 | 505,725 |
| 1994 | -- | 719,268 | (93,812) | 625,456 |
| 1995 | -- | 459,272 | 21,300 | 480,572 |
| 1996 | -- | 506,159 | (16,507) | 489,652 |
| 1997 | -- | 304,475 | 13,116 | 317,591 |
| 1998 | -- | 176,166 | 6,324 | 182,490 |
| 1999 | -- | -- | -- | |
| Total | $594,883 | $3,127,981 | ($29,635) | $3,693,229 |
| Total - Reducing the Effect of Cost-Shifting | $594,883 | $4,920,299 | $135,978 | $5,651,160 |

EXHIBIT
010413